**Daniel R. GRANGER, an individual, Plaintiff,**

**v.**

**Suzanne KLEIN, an individual, Jostens, Inc., a foreign corporation, Grosse Pointe Public School System, a Michigan school district, Caryn Wells, an individual, Karen Clein, an individual, and Thomas Teetaert, an individual, Defendants.**

**No. 00–CV–70386–DT.**

United States District Court, E.D. Michigan, Southern Division.

March 28, 2002.

Richard F. Darke, St. Clair Shores, MI, for Daniel R. Granger.

Julie A. Lawson, Bodman, Longley, Detroit, MI, Mark W. McInerney, Clark Hill, Detroit, MI, Thomas G. Cardelli, Nicholas S. Andrews, Cardelli, Hebert, Royal Oak, MI, Robert J. Lantzy, Secrest, Wardle, Mt. Clemons, MI, for Suzanne Klein, Grosse Pointe Bd. of Educ., Caryn Wells, Karen Clein, Thomas Teetaert.

James R. Kohl, Novi, MI, Mark W. McInerney, Detroit, MI, for Jostens, Inc.

James R. Kohl, Novi, MI, for Jostens Photography, Inc.

Mark W. McInerney, Clark Hill, Detroit, MI, Thomas G. Cardelli, Cardelli, Hebert, Royal Oak, MI, for Grosse Pointe School System.

## MEMORANDUM OPINION AND ORDER AND NOTICE OF SCHEDULING CONFERENCE

HOOD, District Judge.

This matter comes before the Court on a Motion for Summary Judgment filed by Defendants Grosse Pointe Public School System, Suzanne Klein, Caryn Wells, Thomas Teetaert and Karen Clein (collectively, "School Defendants"). Also before the Court is Defendant Jostens Motions for Summary Judgment and Involuntary Dismissal. For the following reasons, this Court **GRANTS** Plaintiff's Motion to Amend, **PARTIALLY GRANTS** the School Defendants' Motion for Summary Judgment, **GRANTS** Defendant Jostens' Motion for Summary Judgment, and **MOOTS** Defendant Jostens' Motion for Involuntary Dismissal.

### I. FACTS

Plaintiff Daniel Granger was a senior at Grosse Pointe High School who was to graduate in June 1998. In May 1998, Defendant Jostens and Jostens Photography published the school's annual yearbook, a page of which displayed a photograph of Plaintiff's genitalia. Plaintiff claims he suffered embarrassment, humiliation and disgrace as a result. Plaintiff claims that "Defendants" and other administrators began an investigation into the source of the yearbook incident, which turned into a "witch hunt" to discover personal and private information about Plaintiff Granger. Plaintiff alleges that the principal (Defendant Wells) and the Yearbook Advisor (Defendant Clein) believed they would lose their jobs over the yearbook incident and would be sued. As a result, Defendants Wells and Clein, along with the Assistant Principal (Defendant Teetaert), allegedly began threatening, and/or promising favors to students for gathering personal information about Plaintiff.

On June 2, 1998, two students who were questioned as part of the investigation allegedly suggested that the high school, the Principal, and the yearbook advisor, should blackmail Plaintiff for statutory rape. "Defendants" contacted the parents of these students and recommended they contact the Grosse Pointe Police Department regarding the allegation of statutory rape committed against two females. Plaintiff was later charged with statutory rape, and served 4½ months in the Dickerson Correctional Facility and two years probation (although Plaintiff claims he was not convicted of any sex crime).

On June 5, 1998, Plaintiff was expelled from school, with only five days remaining until graduation. A letter was placed in his file which allegedly accuses Plaintiff of deviate behavior, and sets forth other falsehoods against Plaintiff. On June 8, 1998, Plaintiff's father received a letter from the high school which sets forth the accusations against Plaintiff. Plaintiff claims that, as a result of the actions of Defendants and the letter in his file, the University of Michigan withdrew his acceptance to the University for the Fall 1998 semester, and that he has also been denied entrance into Wayne State University and the University of Miami (Ohio). Plaintiff claims that he can no longer pursue his desire to go into politics.

Plaintiff brought a ten count complaint against the Defendants in Wayne County Circuit Court on December 23, 1999. For the most part, the Counts did not set forth which specific defendant was being sued for the respective count. Count I alleged various types of invasion of privacy, including intrusion upon seclusion, public disclosure of embarrassing facts, and placing Plaintiff in a false light. Count II also alleged invasion of privacy under the Michigan, and the United States Constitutions. This Count appears to apply only to the Grosse Pointe Defendants, not to the Jos-

tens Defendants. Count III alleged intentional infliction of emotional distress. Count IV alleged negligence in publishing and distributing the yearbook picture. Count V alleged defamation in publishing the June 1998 letter to third parties. Count VI alleged a denial of procedural due process in expelling Plaintiff without notice and an opportunity to be heard. Count VII alleged that Plaintiff was denied equal protection of the laws because, as a male student, he was treated differently than similarly situated female students with respect to the school's sexual harassment policy. Count VIII alleged that Defendants violated Title IX, *inter alia,* by allowing a sexually hostile environment to exist. Count IX alleged that Defendant interfered with Plaintiff's contractual relations with the University of Michigan, in that the University withdrew its acceptance of Plaintiff as a student. Count X alleged negligent supervision in the printing, publishing, and distributing of the yearbook.

Pursuant to 28 U.S.C. § 1441, Defendants removed this action on January 24, 2000, because the Complaint alleged federal questions, thereby allowing jurisdiction under 28 U.S.C. § 1331. On September 29, 2000, this Court dismissed Count V (Defamation) as to all Defendants based on the statute of limitations. This Court also denied Defendants' Motion to Dismiss based on governmental immunity without prejudice pending discovery as to the proprietary function exception. Counts IV (Negligence) and X (Negligent Supervision) were dismissed as to Defendants Wells, Clein and Teetaert only, and Defendant Grosse Pointe Board of Education was dismissed from the entire case as an entity not amenable to suit.

On October 20, 2000, Plaintiff filed an Amended Complaint that named the Grosse Pointe Schools District as a Defen-

dant and purported to demonstrate the proprietary nature of the yearbook. The Amended Complaint also added a defamation claim against the District, Defendant Wells and other administrators of the high school, alleging that the June 8, 1998 letter was published to Wayne State University, Miami University of Ohio, and Bowling Green State University. Defendants Grosse Pointe School District, Klein, Wells, Teetaert, Clein and Jostens move for summary judgment on Plaintiff's Amended Complaint on June 29, 2001.[1] On October 16, 2001, Defendant Jostens filed a Motion for Involuntary Dismissal pursuant to Fed.R.Civ.P. 41(b). Plaintiff filed untimely Response briefs to each of these Motions on October 18, 2001.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Wojcik v. City of Romulus,* 257 F.3d 600, 608 (6th Cir.2001); *Nelson v. City of Flint,* 136 F.Supp.2d 703, 712 (E.D.Mich.2001). The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. *See Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996); *Nelson,* 136 F.Supp.2d at 712. Once a properly supported summary judgment motion has been filed, however, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548; *Nelson,* 136 F.Supp.2d at 712. Moreover, the court need not accept as true legal conclusions or unwarranted factual inferences. *Varljen v. Cleveland Gear Co., Inc.,* 250 F.3d 426, 429 (6th Cir.2001); *Hoeberling v. Nolan,* 49 F.Supp.2d 575, 577 (E.D.Mich.1999).

For a dismissal to be proper, it must appear beyond doubt "that the plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint." *Varljen,* 250 F.3d at 429. Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. In such a situation, there can be "no

---

1. Plaintiff also moves this Court to allow him to amend his complaint a second time to correctly name Defendant Grosse Pointe Public Schools as "Grosse Pointe Public School System." At oral argument, all Defendants consented to Plaintiff's Motion to Amend. A Consent By Defendant Grosse Pointe Public Schools was filed on October 18, 2001 (Docket number 61). Accordingly, the Court **GRANTS** Plaintiff's Motion to Amend.

genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* A court must look to the substantive law to identify which facts are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## III. ANALYSIS

### A. Violations of Local Rule 7.1

As an initial note, Plaintiff has failed to comply with at least two local rules of the Eastern District of Michigan. Local Rule 7.1(d)(1)(B) (E.D.Mich. Sept. 8, 1998) states that "[a] response to a dispositive motion must be filed within 21 days after service of the motion." All Defendants in this case filed motions for summary judgment on June 29, 2001. Plaintiff delivered his response motions to these chambers on October 11, 2001, nearly three and one half months after Defendants' motions had been filed, and only filed his response with the Court Clerk after being told to do so during oral arguments held on October 17, 2001. This is in clear violation of the local rules of this district.

Plaintiff's brief in opposition to the School Defendants, numbering thirty-eight (38) pages, violates Local Rule 7.1(c)(3)(A) of the Eastern District of Michigan, which states that "[t]he text of a brief supporting a motion or response, including footnotes and signatures, may not exceed 20 pages. A party seeking to file a longer brief may apply *ex parte* in writing setting forth the reasons." The commentary to this Rule emphasizes that the Rule's 20–page limit "will be strictly enforced," and that "[a]ttempts to circumvent the Local Rule in any way may be considered an abusive practice which may result in the motion or response being stricken as well as sanctions being imposed." *See Rainbow Nails Enter., Inc. v. Maybelline, Inc.,* 93 F.Supp.2d 808, 810 n. 1 (E.D.Mich.2000).

In light of Plaintiff's blatant disregard of the local rules of this district, this Court will only consider the first twenty pages of Plaintiff's response brief, and page 31 wherein Plaintiff voluntarily dismisses the defamation claim in his Complaint.

### B. Plaintiff's Remaining Counts

Plaintiff's remaining Counts are as follows: Counts I (Tortious Invasion of Privacy); II (Constitutional Invasion of Privacy); III (Intentional Infliction of Emotional Distress); IV (Negligence); VI (Denial of Due Process); VII (Equal Protection) against the Defendant District; and Defendants Klein, Wells, Teetaert, and Clein; Count IV (Negligence) against the Defendant District and Defendant Klein; Count IX (Tortious Interference with Contractual Relationships) against Defendant Wells; and Count X (Title IX) against the Defendant District and Defendant Klein. Plaintiff asserts two claims against Defendant Jostens are: Count I (Invasion of Privacy) and Count IV (Negligence).

Lower-level officials, employees, and agents such as Defendants Wells, Clein and Teetaert, are immune from tort liability only when they are: (1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts. *Eichhorn v. Lamphere Sch. Dist.,* 166 Mich.App. 527, 538–39, 421 N.W.2d 230 (1988). However, Defendants Wells, Clein and Teetaert are not immune from liability for intentional torts. *See Sudul v. City of Hamtramck,* 221 Mich.App. 455, 458, 480–481, 562 N.W.2d 478 (1997).

### 1. Summary Judgment is GRANTED as to the District and Defendant Klein on all Tort Claims

Defendants claim that the Defendant District and Defendant Klein are ab-

solutely immune from Plaintiff's state tort claims (Count I—Invasion of Privacy; Count III—Intentional Infliction of Emotional Distress; Count IV—Negligence; and Count X—Negligent Supervision). Defendants are correct.

■ Michigan law provides that "all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function." MCL § 691.1407(1). Michigan courts have construed this provision to afford governmental agencies with immunity from negligence-based as well as intentional torts. *Smith v. Department of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987).

Michigan law provides an exception to governmental immunity when the governmental entity engages in a proprietary function. Specifically, Michigan law states in pertinent part:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees.

MCL § 691.1413. "While labeled an 'exception,' the proprietary function exception is actually the *antithesis* of a governmental function itself. That is, as statutorily defined, the proprietary function exception means that an activity is *not* a governmental function because the primary motive is to make a profit and is one not normally supported by taxes and fees." *Harris*, 219 Mich.App. at 691–92, 558 N.W.2d 225 (emphasis in original). Plaintiff contends that the operation of the yearbook at Grosse

Pointe High School is a proprietary function, falling within this exception.

■ Whether a function is governmental or proprietary is a question of law to be decided by the court. *See Coleman v. Kootsillas*, 456 Mich. 615, 624, 575 N.W.2d 527 (1998) (affirming a remand by the Court of Appeals to the trial court after declaring that a particular function was proprietary in nature). The phrase "governmental function" in M.C.L. § § 691.1407 is to be interpreted broadly, *Ross v. Consumers Power*, 420 Mich. 567, 618, 363 N.W.2d 641 (1984), and encompasses any activity "which is expressly or impliedly mandated or authorized by constitution, statute, or other law." *Id.* at 620, 363 N.W.2d 641; *see also Harris v. Univ. of Mich. Bd. of Regents*, 219 Mich. App. 679, 684, 558 N.W.2d 225 (1997). In order to determine whether a governmental agency engages in a governmental function, the court must look at the general activity being performed, rather than the specific conduct involved at the time of the tort. *See Smith v. Department of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987).

■ Citing *Coleman*, Plaintiff argues that the yearbook operation is proprietary in nature because it was conducted primarily for the purpose of producing profit, and cannot normally be supported by taxes. The *Coleman* court wrote:

> We previously held that the definition of proprietary function is clear and unambiguous.... Two tests must be satisfied: The activity (1) must be conducted primarily for the purpose of producing a pecuniary profit, and (2) it cannot be normally supported by taxes and fees. In determining whether the agency's primary purpose is to produce a pecuniary profit, we stated that certain considerations should be taken into account. The first is whether a profit is actually

generated. The fact that a governmental agency pursues an activity despite consistent losses may be evidence that the primary purpose is not to make a pecuniary profit, but it is not conclusive evidence. Conversely, the fact that the activity consistently generates a profit may evidence an intent to produce a profit.

The second consideration is "where the profit generated by the activity is deposited and how it is spent." If the profit is deposited in the governmental agency's general fund or used to finance unrelated functions, this could indicate that the activity at issue was intended to be a general revenue-raising device. If the revenue is used only to pay current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit.

*Coleman,* 456 Mich. at 621–22, 575 N.W.2d 527.

Plaintiff's Amended Complaint alleges that the yearbook earnings are from sales to students, that the profits go into the school's general fund, and that the yearbooks are not typically supported by taxes. Defendants have included Exhibit I to show that the yearbook operated at a loss of $10,000 in 1998. Exhibit I further indicates that the yearbook generally produces pecuniary profits, and that the profits are intermingled with the general fund including fees and expenses involving towel fees, child day care, Sadie Hawkins dances, computers, class gifts, and homecoming films.

Plaintiff claims that the general activity which Defendants were performing is the publication and distribution of a yearbook. Plaintiff argues that this activity is not a governmental function because the purpose of school is to provide a free public education, which does not include selling yearbooks for profit. In support, Plaintiff relies on the Michigan Constitution, Article 8, §§ 1–2 (providing that "education shall forever be encouraged" and that the "legislature shall maintain and support a system of free ... schools"). Plaintiff also argues that nowhere in the section of Michigan's Revised School Code which sets forth the powers and duties of the board of education does it state that the board has the power to publish and distribute yearbooks. *See* M.C.L. §§ 380.1201 *et seq.* Plaintiff claims that the legislature has specifically prohibited schools from disseminating sexually explicit matters to minors. *See* M.C.L. §§ 722.6768.

Plaintiff insists that if selling yearbooks were a governmental function, then the books would not be subject to a sales tax, citing MAC § R205.74. The Amended Complaint further alleges that the District conducted a proprietary function by selling and profiting from the sale of yearbooks, that the sales and profits go to the District's and/or School's general fund, and that the yearbooks are taxable to each purchaser and thus not supported by the property taxes which support the District's governmental and non-proprietary functions and activities.

The Court is not persuaded by Plaintiff's arguments. As *Coleman* points out, the factors the court lists are merely indicia of a proprietary function. *See id.* at 621–22, 575 N.W.2d 527. In the instant case, it cannot be reasonably disputed that the primary purpose of the yearbook is to teach the skills associated with its publication. In light of this underlying purpose, this Court concludes that the facts Plaintiff points to do not convert the governmental function of producing a yearbook into one of a proprietary nature.

As Defendants noted, daily operation of a public school includes a range of non-academic activities, such as: providing crossing guards, taking students on field

trips, operation of a building trades class, athletic programs, and conducting a homecoming parade, and rely on M.C.L. § § 380.1282 for authorization to produce and distribute yearbooks. Pursuant to § 380.1282 which, among other things, affords the school district the authority to determine the courses of study to be pursued, Grosse Pointe North High School offered a yearbook class that taught students how to organize, publish and distribute a yearbook. In Defendants' estimation, these facts indicate that operating a yearbook constitutes a governmental function.

While nothing in the school code expressly authorizes yearbook sales, *Eichhorn* instructs that this is not always required. In *Eichhorn*, the court found that a homecoming parade was a governmental function because, although it was not expressly authorized by statute or law, § 380.1282 authorized school districts to establish and administer programs which were desirable "for the maintenance and improvement of its schools *and determine the courses of study to be pursued." See* M.C.L. § 380.1282 (emphasis added).[2] Similarly, the fact that the yearbook has an advisor, shows the school district thought it necessary to the maintenance and improvement of the schools. Given the school board's ability to determine the courses of study to be pursued, the Court is not willing to declare the production of a yearbook, which is part of a course instituted by the school board, non-governmental. For these reasons, this Court finds that the yearbook operation is not a proprietary function, and the District maintains absolute immunity in this instance.

While a finding of governmental function does not foreclose any analysis of the proprietary function exception, "once the governmental function analysis is made and it has been determined that the activity has the indicia of a traditional governmental function, the conclusion is virtually inevitable that the activity in question is not proprietary." *Harris*, 219 Mich.App. at 692, 558 N.W.2d 225. This Court is convinced that the specific incident of operating a yearbook is part of the general activity of teaching, which is a governmental function. The yearbook operation is not proprietary in nature. Because Plaintiff is unable to establish that profit was the district's *primary* motive in operating its yearbook program or that such an activity is not normally supported by taxes, the Court determines that the operation is a governmental function. *See id.*

Further, Plaintiff's claim of negligent supervision is as to the operation of a public school. Michigan case law informs the Court that such a claim may be properly disposed of by granting summary judgment to Defendant School District on the basis of governmental immunity. *See Belmont v. Forest Hills Pub. Schs.*, 114 Mich. App. 692, 695–96, 319 N.W.2d 386, 388 (1982). Defendants' Motion for Summary Judgment is GRANTED as to all tort claims against the District.

Similarly, M.C.L. § 691.1407(5) states that the "highest appointive executive official" of a level of government is "immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Executive officials are also immune from negligence-based as well as intentional torts. *Smith v. Department of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987). Dr.

**2.** MCL § 380.1282 states that "[t]he board of a school district shall establish and carry on the grades, schools, and departments it considers necessary or desirable for the mainte- nance and improvement of its schools and determine the courses of study to be pur- sued."

Suzanne Klein, the Superintendent of Grosse Pointe School District, is the District's "highest appointive executive official." *See Nalepa v. Plymouth–Canton Cmty. Sch. Dist.*, 207 Mich.App. 580, 590–91, 525 N.W.2d 897, 902 (1994). Because the allegations claimed by Plaintiff against Dr. Klein arise out of her performance of duties within the scope of her employment as the Superintendent, Plaintiff's tort claims against Dr. Klein are barred by M.C.L. § 691.1407(5). *See id.*

## 2. Summary Judgment is GRANTED as to Defendants Wells, Teetaert, Clein and Jostens on the Common Intentional Tort Claims[3]

### a. Common Law Invasion of Privacy

■ Plaintiff also alleges that Defendants Principal Wells, Vice–Principal Teetaert, and Yearbook Advisor Clein ("Individual Defendants") are liable for invasion of privacy. Michigan's governmental immunity statute shields governmental employees for acts of mere negligence. *See* M.C.L. § 691.1407(2). In *Sudul v. City of Hamtramck*, 221 Mich.App. 455, 481, 562 N.W.2d 478 (1997), however, the Michigan Court of Appeals "confirmed the common sense proposition that an individual employee's intentional torts are not shielded by [Michigan's] governmental immunity statute. This is because a defendant who commits an intentional tort is even more culpable than a defendant who is grossly negligent, and therefore the gross negligence exception in M.C.L. § 691.1407(2) must be read to include intentional conduct." *Hullett v. Smiedendorf*, 52 F.Supp.2d 817, 828–29 (W.D.Mich.1999). Therefore, the Individual Defendants, if found to have committed the intentional torts alleged, would not be shielded by Michigan's governmental immunity statute.

■ Because the Michigan legislature has not defined the rights of privacy, this Court must resort to the common-law cause of action, which protects against four types of invasion of privacy: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness. *Lansing Assn. of School Adm'rs v. Lansing Sch. Dist. Bd. of Educ.*, 216 Mich. App. 79, 87, 549 N.W.2d 15 (1996), *rev'd in part on other grounds*, 455 Mich. 285, 565 N.W.2d 650 (1997). Only the first three forms are alleged against the school defendants, while Plaintiff alleges the first two types against Defendant Jostens.

### i. Intrusion into Seclusion

■ To prevail against the Individual Defendants on his claim of intrusion into seclusion, Plaintiff must establish three elements. *Id.* First, Plaintiff must demonstrate the existence of a secret and private subject matter. *Id.* Second, Plaintiff must possess a right to keep that subject matter private. *Id.* Finally, Plaintiff must show that the Defendant obtained information about that subject matter through some method objectionable to the reasonable person. *Id.*

■ Defendants argue that Plaintiff has not shown the existence of a secret and private subject matter. This Court disagrees. The image depicted on the picture at issue is of Granger urinating with his genitalia visible in the photo. Both genitalia and urinating, under most circumstances, would be considered "private" and "secret." *See, e.g., Daily Times Democrat v. Graham*, 276 Ala. 380, 383, 162

---

**3.** As to Jostens, Plaintiff only alleges the in- tentional tort of invasion of privacy.

So.2d 474, 477 (1964) (stating that a photo of plaintiff's body "exposed from the waist down with the exception of that portion covered by her 'panties,'" was not only "embarrassing to one of normal sensibilities, but also "properly classified as obscene.""). Granger has presented evidence of the existence of a subject matter that is private, one in which he had the right to keep private. Absent a knowing, consensual waiver, this right to privacy in inviolate. *See Doe v. Mills,* 212 Mich.App. 73, 87, 536 N.W.2d 824 (1995).

Plaintiff also claims that he did not waive his right to privacy. The uncontested facts indicate that the photo was taken by a female classmate during Plaintiff's sophomore year at his friend's grandfather's house after a Sadie Hawkins dance, and that Plaintiff neither encouraged nor expected to be photographed while exposed. Dep. of Daniel Granger, pages 430–32. The facts further indicate that Plaintiff, and a few other students, knew the photo existed, but that it was not "common knowledge" at the school. As Plaintiff testified, it was not "a big enough deal." *Id.* at 432, lines 9–18. Plaintiff further testified that he was uncertain as to whether he had ever seen the photo after it was taken but before it was being considered for inclusion in the collage. *Id.* at 431, lines 21–25. There is no indication that Plaintiff ever attempted to retrieve the photo after is was taken.

According to Plaintiff, he did not know that the photo was to be included in the yearbook. For support of his contention, Granger points to the deposition of Jason Aubrey, who, in response to the question of whether the other boys on the page knew that the picture was to be included in the collage, stated: "I'm not too sure about that." Dep. of Jason Aubrey, page 19, line 15. Aubrey also testified that "Dan knew the picture existed, but he didn't know it was gonna go in the yearbook." *Id.* at 18,

line 5. Defendants respond that Granger knew that the picture was being considered for inclusion in the collage. For support, Defendants also cite to the deposition testimony of Jason Aubrey, wherein he was asked whether Granger was part of discussions regarding whether to include the photo and answered, "Yes." *Id.* at 18, line 14.

A review of the Aubrey's deposition testimony reveals that Aubrey had considered approximately fifteen different collages before he turned the final copy in for publication. During his deposition, Aubrey was asked several questions regarding Granger's knowledge of both the existence of the photo and the potential inclusion in the collage:

Q. As with respect to this picture, the picture—

A. Uh-huh.

Q.—I'm referring to is the top left-hand picture.

A. Uh-huh, I see it.

Q. Was that picture ever part of those fifteen permutation?

A. It was talked about before I handed in the final draft, yes.

Q. And when it was talked about—

A. Uh, huh.

Q.—was it talked about in the presence of Dan Granger?

A. *Dan knew the picture existed, but he did not know that it was gonna go in the yearbook.*

Q. *So when you're saying you talked about it, was Dan Granger part of those discussions?*

A. *I'm sure he was.*

Q. *So again, when you're saying you talked about it, were you talking amongst your friends, saying, you know, do you want to put this pic-*

*ture in, do you want to put that picture in?*

A. *Yes.*

Dep. of Jason Aubrey, pages 17–18 (emphasis added).

Defendants also point to Aubrey's testimony to argue that Plaintiff did not object to the inclusion of the photo in the collage. Plaintiff retorts that Defendants have not "shown any law which states that the Plaintiff has a legal duty to object especially when common sense dictates that the picture would not be published." *See* Pl.'s Resp. to Grosse Pointe Sch.Dist., Klein, Wells, Teetaert and Clein's Mot. for Summ.J. at 10 (hereinafter referred to as "Pl.'s Resp.Br. to Sch.Defs."). Plaintiff's argument might be true if there were some evidence that the boys were essentially joking about the picture's inclusion in the collage. On the other hand, a reasonable person might have objected at the mere suggestion of the photo's submission. The Court concludes that the deposition testimony is inconclusive because, when asked whether anyone ever told him not to include the picture, Aubrey never gave a conclusive answer.

If Plaintiff acquiesced in the picture's inclusion, this would likely constitute a waiver of Plaintiff's right to keep what is generally a "secret and private subject matter" private. *Mills*, 212 Mich.App. at 87, 536 N.W.2d 824 (stating that a person can waive his right to privacy with knowledge and consent). Whether Granger's claim of interference with his right to privacy is in fact unreasonable or serious depends on whether he had "in any particular or degree abandoned [the subject matter's] strictly private character and waived to any extent the right to absolute privacy." *Pallas v. Crowley–Milner & Co.*, 334 Mich. 282, 285, 54 N.W.2d 595 (1952).

This Court finds that, while the subject matter of the photo is undoubtedly a private subject matter that Granger had the right to keep private, controversy exists as to whether Plaintiff waived the private nature of the subject matter by allowing the photo to remain in the general public for two years prior to its publishment in the yearbook. This Court also finds a question of fact regarding whether Plaintiff acquiesced in the photo being included in the yearbook, thereby waiving his right to privacy yet again. Because all parties rely of Aubrey's equivocal testimony, a triable issue of fact exists as to the credibility of both Aubrey and Plaintiff. *See id.* at 285–86, 54 N.W.2d 595 ("The testimony in the case warranted submission to the jury of the question of whether plaintiff had cast aside the cloak of privacy of the ordinary, private person ... and thereby waived her right to be free from an invasion of privacy."); *see also Lansing Assn. of School Adm'rs*, 216 Mich.App. at 87, 549 N.W.2d 15 (stating that the contours and limits of the right to privacy are to be determined by the trier of fact on a case-by-case basis).[4] Plaintiff's claim must fail, nonetheless, because Plaintiff has not shown that the Defendants obtained the photo through some method objectionable to the reasonable person.

It is undisputed that the picture depicting Granger's genitalia was not taken by Granger but by another student with a

---

4. Defendants also argue that Plaintiff had no right to keep his sexual indiscretions private, since they were the subject of a criminal investigation. Plaintiff has clarified his claim, however, by noting that he does not argue that "Defendants' disclosure to the freshman girls' parents or to the Plaintiff's parents were disclosures of a protected right of privacy." *See* Pl.'s Resp.Br. to Sch.Defs. at 14. Though this clarification was in the context of Plaintiff's claim for public disclosure of private facts, it appears to apply to Granger's claim of intrusion into seclusion.

camera owned by a third student. Defendant Clein claims that, "to this day, [she has] been unable to determine exactly how that picture came to be included in the yearbook, as it should have been discovered during the editing process." Aff. of Karen Clein, ¶ 2. Defendant Clein also admits that "[t]he job of editing the yearbook is performed by the students who make up the yearbook staff." *Id.* at ¶ 3. It is also undisputed that the photo came to be in the yearbook after Plaintiff's friend, Jason Aubrey, snuck the photograph into the yearbook on the page he and Plaintiff purchased. Because there has been no evidence presented to show that Defendant Clein had any involvement in the acquisition of the photo for inclusion in the yearbook, this Court concludes that Plaintiff's claim of intrusion into seclusion against Defendant Clein fails.

Similarly, Plaintiff's claim against Jostens must fail because, as Defendant Jostens argues, Plaintiff has not demonstrated that Defendant Jostens received the photo via an objectionable means. To support his agency theory of liability, Plaintiff asserts, without authority, that the District and Jostens were "joint venturers." Plaintiff theorizes that "Defendant's joint venturer, through their yearbook staff, over which they had complete control and supervision, changed the collage, which was submitted and either negligently or intentionally obtained the picture of Plaintiff's genitals." *See* Pl.'s Br. in Resp. to Def. Jostens' Mot. for Summ.J. at 8 (hereinafter referred to as "Pl.'s Resp.Br. to Def. Jostens"). This Court is not persuaded by this argument.

 Black's Law Dictionary defines a "joint venture" as "[a] business undertaking by two or more persons engaged in a single defined project." BLACK'S LAW DICTIONARY 843 (7th ed.1999). Michigan courts have delineated the elements of a joint venture as being: (a) an agreement indicating an intention to undertake a joint venture; (b) a joint undertaking of (c) a single project for profit; (d) a sharing of profits as well as losses; (e) contribution of skills or property by the parties; (f) community interest and control over the subject matter of the enterprise. *Meyers v. Robb,* 82 Mich.App. 549, 557, 267 N.W.2d 450, 454 (1978). Plaintiff has adduced no evidence that these elements have been met in the instant case. Defendant District and Defendant Jostens merely agreed that the latter would publish the yearbook that the students of the former would compile; there is no evidence of a joint venture. Plaintiff's intrusion into seclusion claim against Defendant Jostens is DISMISSED.

This Court further concludes that the subsequent investigation into the placement of the photo at issue was within the scope of duty of Defendants Teetaert and Wells. While there are allegations of animus toward Plaintiff, there has been no indication that Defendants Wells, Teetaert, or Clein acted in bad faith, that they failed to perform ministerial duties, or that either of these Defendants intentionally allowed the yearbook to be published knowing that it contained the offensive picture.[5]

Nor has any evidence been produced demonstrating the conspiracy theory advanced by Plaintiff regarding the allegations of statutory rape. Plaintiff argues that "[t]he police have the authority to conduct a criminal investigation not the school." *See* Pl.'s Resp.Br. to Sch.Defs. at 12. Even viewing the Amended Complaint

---

**5.** As explained in this Court's Memorandum Opinion and Order dated June 29, 2000, Plaintiff's claim that Defendants Wells, Teetaert and Clein negligently edited the yearbook is prohibited by Michigan's governmental immunity statute, M.C.L. § § 691.1407. *See Granger v. Klein, et al.,* Case No. 00–CV–70386–DT at 13–14.

in a light most favorable to the Plaintiff, he has not shown that the school conducted an improper "criminal investigation." The allegations merely demonstrate that the school investigated the yearbook incident. The allegations further demonstrate that after being told of sexual conduct allegedly perpetrated by Plaintiff, the school informed the alleged victims' parents. Finally, the allegations show that the school performed its duty to investigate allegations of peer sexual harassment under Title IX after being informed that Plaintiff had allegedly violated the school's policy in this regard. *See generally Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (requiring that recipient of federal funds not respond with "deliberate indifference" to allegations of sexual harassment). The Court finds these allegations insufficient to establish a claim for intrusion into seclusion. Accordingly, Plaintiff's claim is also DISMISSED as to Defendants Wells and Teetaert.[6]

### ii. Public Disclosure of Private Facts

■ To prevail on a claim that Defendants Wells, Teetaert, Clein and Jostens have published private facts, Granger must show that the disclosed information was highly offensive to a reasonable person and of no legitimate concern to the public. *Lansing Assn. of School Adm'rs,* 216 Mich. App. at 89, 549 N.W.2d 15. In addition, Granger must demonstrate that the publicity concerned his private, as opposed to public, life. *Id.*

■ Plaintiff argues that the Defendants violated his right of privacy by publishing his genitals in the school's yearbook. In response to this accusation, the School Defendants argue that "[t]he photo-

graph of plaintiff, while inappropriate for the yearbook, is small in size and content, not easily discovered, [and] is not highly offensive to the reasonable person." *See* Br. in Supp. of Sch.Defs.' Mot. for Summ.J. at 10 (hereinafter referred to as "Sch.Defs.' Br."). Defendant Jostens makes a similar argument. *See* Br. in Supp. of Def. Jostens, Inc.'s Mot. for Summ.J. at 6 (hereinafter referred to as "Def. Jostens' Br."). This Court finds that a reasonable person may disagree with this contention. The content of the photo was of Plaintiff's genitals, which may constitute information that is "highly offensive to a reasonable person" in this context. Assuming Plaintiff has not waived the private nature of his genitalia, a publication of private facts may have occurred.

Defendants further argue that Plaintiff has not demonstrated that he was embarrassed by the publication of the photo. Because the standard for offensiveness in the context of a publication of private facts suit is objective, the subjective opinion of the alleged victim is not pertinent to this inquiry. *See* RESTATEMENT (SECOND) OF TORTS §§ 652D (1976) (tort of publishing private facts). The RESTATEMENT OF TORTS describes the publicity that gives rise to an action for public disclosure of embarrassing private facts:

> The rule stated in this Section gives protection only against unreasonable publicity, of a kind highly offensive to the ordinary reasonable man ... It is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises.

RESTATEMENT (SECOND) TORTS § 652D, cmt. c.

---

**6.** "Only after it has been determined that the doctrine of governmental immunity does not protect the governmental unit from liability does any question of vicarious liability based upon respondeat superior arise." *Coleman,*

456 Mich. at 620–21, 575 N.W.2d 527. Because the yearbook is a governmental function, this Court need not address *respondeat superior* as a theory of liability. *McIntosh,* 111 Mich.App. at 700, 314 N.W.2d 728.

As stated earlier, a photo of an individual's genitalia, under these circumstances, may be considered offensive to the reasonable person. There has been no showing that Plaintiff's genitalia are a legitimate public interest. Similar to Plaintiff's claim of intrusion into seclusion, however, Plaintiff's instant claim fails because he has not shown a triable issue of material fact as to whether Defendants Wells, Teetaert, Clein or Jostens intentionally disclosed the private fact at issue in this case. As stated above, the undisputed facts indicate that one of Plaintiff's friends, Jason Aubrey, was responsible for sneaking the photo into the yearbook. There is no indication that Aubrey's actions were in any way advocated by or committed upon the behest of any of the named Defendants. Plaintiff's public disclosure of private facts claim cannot survive summary judgment.

### iii. False Light[7]

 In order to maintain an action for false-light invasion of privacy, Plaintiff must show that the Defendants broadcasted information that was unreasonable and highly objectionable to the public in general, or to a large number of people, by attributing to him characteristics, conduct, or beliefs that were false and placed Plaintiff in a false position. *Porter v. Royal Oak,* 214 Mich.App. 478, 487, 542 N.W.2d 905 (1995). Granger must also demonstrate that the contested depiction is untrue to survive summary judgment. *Id.* There is a question whether the false light theory of invasion of privacy requires a showing of intentional conduct, as opposed to knowledge or reckless conduct. *See Travis v. Dreis & Krump Mfg. Co.,* 453 Mich. 149, 170–171, 551 N.W.2d 132 (1996);

*Sawabini v. Desenberg,* 143 Mich.App. 373, 381 n. 3, 372 N.W.2d 559 (1985).

 Plaintiff argues that Defendants publicized the letter written by Defendant Wells on June 8, 1998. According to Plaintiff, "[i]t is uncontested that defendants broadcasted that letter to a large number of people, the broadcasting it to the Plaintiff's father, the freshmen girls' parents, the University of Michigan, '48 hours' news show, and the jury in the civil lawsuit just concluded without objection." *See* Pl.'s Resp.Br. to Sch.Defs. at 16. These allegations are, in fact, contested by Defendants. However, even assuming that Plaintiff's allegations are true, Plaintiff's claim fails because he has not demonstrated that the contested statements are untrue. Even if the statements were untrue, Granger has not shown that Defendants either recklessly or intentionally published false information.

The letter of June 8, 1998 containing the statements that potentially attributed to Granger's characteristics, conduct, or beliefs that were false and placed the Plaintiff in a false position also contains statements that demonstrate that the allegations were throughly investigated before being reported to Plaintiff and his father. Defendant Wells prefaced each allegation with comments such as: "I have reviewed the statements of North High School female students who assert ...'; "One of the students claimed ...'; "Parents have called me to tell me ...'; "I have had numerous other calls of complaint about ...'; "Some of the students who have complained of sexual harassment indicated to me ...'; and "Based on interviews with North High School stu-

---

**7.** Although Defendant Jostens argues that Plaintiff cannot establish the elements of false light as against it, Plaintiff's Response Brief does not address Defendant's argument. This Court concludes that Plaintiff is not pursuing a false light claim against Defendant Jostens.

Indeed, there has been no allegation that the photo inaccurately portrayed Plaintiff in any fashion, and Plaintiff admits in his deposition that he does not know how Defendant Jostens portrayed him in a false light. *See* Dep. of Daniel Granger at 413–14.

dents...." *See* Pl.'s Resp.Br. to Sch.Defs. at. Ex. 7. Such comments demonstrate that Defendant Wells did not recklessly or intentionally publish false reports of inappropriate conduct. To the contrary, the face of the letter reveals a thorough and complete investigation of the allegations.

Plaintiff argues that the June 8, 1998, letter "contained nothing but lies." *See* Pl.'s Resp.Br. to Sch.Defs. at 16. Such blanket allegations are insufficient to defeat summary judgment. To survive a summary judgment motion on a false light claim, the Plaintiff must demonstrate that the allegations are false. Plaintiff has failed to do so. As such, Plaintiff's false light claim must be dismissed.

### 3. Summary Judgment is DENIED as to Plaintiff's Constitutional Invasion of Privacy Claim

 Plaintiff alleges that the Defendant District, Defendants Wells, Klein, Teetaert, Clein, and other administrators of the high school denied him his right to privacy under the Fourteenth Amendment to the United States and Michigan Constitutions, and has asked for compensatory and punitive damages. Specifically, Plaintiff argues that his privacy was infringed upon because: (1) the Defendants published a photograph of Plaintiff with his genitals exposed without his consent; and (2) Defendants conducted an investigation into Plaintiff's sexual relationships. Defendants have not addressed Plaintiff's second contention.

As to Plaintiff's first argument, Defendants contend that the constitutional invasion of privacy claim must fail because "there is no general federal common law of torts which alone would entitle plaintiff to damages for alleged invasion of privacy." *See* Sch.Defs.' Br. at 12. Plaintiff re-

sponds that "42 U.S.C. § 1983 prescribes Plaintiff's rights to compensatory and punitive damages." *See* Pl.'s Resp.Br. to Sch.Defs. at 17. While Plaintiff is correct, his Amended Complaint does not mention § 1983 as the basis for his constitutional claim, and the elements of a § 1983 claim are not discussed in Plaintiff's Response Brief. This Court will nonetheless address Plaintiff's contention.

To state a claim under § 1983, Plaintiff must allege that conduct complained of was committed by a person acting under color of state law, and that the conduct deprived Plaintiff of rights, privileges or immunities secured by the United States Constitution or laws of the United States. *See Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992). Plaintiff must show that: 1) the conduct at issue was under color of state law; 2) the conduct caused a deprivation of constitutional rights; and 3) the deprivation occurred without due process. *Nishiyama v. Dickson County,* 814 F.2d 277, 279 (6th Cir. 1987).

Neither Plaintiff nor Defendants address the first and third prongs of a § 1983 claim. Defendants assert an argument against Plaintiff's fulfillment of the second prong, however. Specifically, Defendants argue that Plaintiff's claim of constitutional protection against disclosure of the yearbook photo "extends far beyond activities traditionally afforded constitutional protection as within 'zones of privacy' created by more specific constitutional guarantees, such as 'marriage, procreation, contraception, family relationships, and child rearing and education.'" *See* Sch. Defs.' Br. at 12. This Court disagrees for the purpose of determining whether Plaintiff has stated a constitutional claim under FED.R.CIV.P. 12(b)(6).[8]

---

**8.** The Court will not review this claim under Rule 56(c) since neither party raised factual

issues to support their respective arguments.

Citing *Bloch v. Ribar,* 156 F.3d 673, 683 (6th Cir.1998), the Plaintiff claims this case involves the constitutional right to control the nature and extent of information released about an individual. This principle has been coined an "informational right to privacy." *Id.* Not all disclosures of private information will trigger constitutional protection, as the right to informational privacy is impacted only when personal rights deemed "fundamental" or "implicit in the concept of ordered liberty" are involved. *Id.* at 684 (*citing J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir.1981)).

■ Analyzing this type of constitutional claim involves a two step process. *DeSanti,* 653 F.2d at 1090–91. First, the interest at stake must implicate either a fundamental right or one implicit in the concept of ordered liberty. Second, the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private. *Id.*

While the Sixth Circuit has narrowly construed the right to interests that implicate a fundamental liberty interest, it has stated that "[o]ur sexuality and choices about sex ... are interests of an intimate nature which define significant portions of our personhood. Publically revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private." *Bloch,* 156 F.3d at 685. Similarly, the public disclosure of a photo of a person's genitalia "exposes an aspect of our lives that we regard as highly personal and private." *See id.* Several courts have recognized the private nature of the genital region, *See, e.g., Fortner v. Thomas,* 983 F.2d 1024, 1030 (11th Cir.1993) ("recognizing a prisoner's constitutional right to bodily privacy because most people have a special sense of privacy in their genitals, and in-

voluntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating") (internal quotation and citation omitted); *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir. 1992) (concluding that "we have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context"); *Cornwell v. Dahlberg,* 963 F.2d 912, 916 (6th Cir.1992) (recognizing that prisoners retain a limited right of privacy in not being subjected to a strip search in front of people of the opposite sex).

In *Cornwell,* the Sixth Circuit noted that "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners." *Id.* at 916. The fact that *Cornwell* was a Fourth Amendment case decided in a criminal context where individuals have less expectation of privacy militates in favor of finding a fundamental right of privacy in preventing government officials from publishing photos of Plaintiff's genitals absent some countervailing purpose. For purposes of determining whether Plaintiff has stated a constitutional claim, the yearbook photograph *could be* worthy of constitutional shelter as a "private" matter. Plaintiff has stated a constitutional invasion of privacy claim.[9]

### 4. Summary Judgment is GRANTED as to Plaintiff's Claim of Intentional Infliction of Emotional Distress

■ Plaintiff next argues that the Defendants are liable for intentional infliction of emotional distress. The Michigan Supreme Court has not expressly declared

---

**9.** The Court will not address the first and third prongs of a § 1983 claim since neither

Plaintiff nor Defendants addressed these two prongs.

that the tort of intentional infliction of emotional distress exists. *See Smith v. Calvary Christian Church*, 462 Mich. 679, 686 n. 7, 614 N.W.2d 590 (2000). Michigan's lower courts have held, however, that the elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824 (1995).

■ Liability for intentional infliction of emotional distress is proper only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. *Id.* Moreover, the conduct must be regarded as atrocious and utterly intolerable in a civilized community. *Id.* "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. It has been said that the case is generally one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (citations omitted).

■ While it is initially for the Court to determine whether the Defendants' conduct reasonably may be regarded as so extreme and outrageous as to permit recovery, "[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Mills*, 212 Mich.App. at 92, 536 N.W.2d 824 (citing 1 Restatement Torts, 2d, §§ 46, comment h, p. 77); *see also Linebaugh v. Sheraton Michigan Corp.*, 198 Mich.App. 335, 342–43, 497 N.W.2d 585 (whether conduct is sufficiently outrageous and extreme to render one liable for the intentional infliction of emotional distress is a matter for determination by the trier of fact).

■ Plaintiff states that the intentional infliction of emotional distress count is predicated upon "the criminal investigation by Dr. Wells and her associates, other school defendants." *See* Pl.'s Resp.Br. to Sch.Defs. at 20. Plaintiff argues that the Defendants' investigation into his private sexual life "centered around threats, cajoling, false promises, and lies." *Id.* Plaintiff further argues that many students were told that Defendants Wells and Clein would lose their positions at the high school if the students did not tell them everything they knew about the Plaintiff's private life away from the school setting. Plaintiff also alleges that Defendant Wells and Clein threatened many students with a variety of punishments ranging from losing their letterman jackets to expulsion if the students did not share information within their knowledge about Plaintiff's private escapades. In Plaintiff's estimation, "[i]t is clearly 'Outrageous' for any school or principal to conduct an investigation in this manner." *Id.*

Defendants argue that, in light of their "inherent and ... statutory power to maintain order and discipline in the schools and to exclude from the student body those who are detrimental to [it] and whose conduct is inimical to the exercise of the ... scholastic function," *Davis v. Ann Arbor Pub. Schs.*, 313 F.Supp. 1217, 1225–26 (E.D.Mich.1970), it was reasonable to investigate Plaintiff's alleged violations of the sexual harassment policy after several freshman girls voluntarily came forward with allegations of his sexual misconduct. Moreover, Title IX of the Education Amendments of 1972 requires a school receiving federal funds to respond to known peer harassment in a manner that is not clearly unreasonable. *See* 20 U.S.C. § 1681; *see also Davis as Next Friend of LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648–49, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Vance v.*

*Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir.2000). These authorities establish not only that the Defendants had a duty to investigate the alleged incidents of sexual harassment but also a duty to respond thereto.

Viewing the facts in a light most favorable to the Plaintiff, the method in which the Defendants conducted their investigation might be considered extreme and outrageous. Plaintiff has alleged that the Defendants engaged in an inquisition of sorts with respect to his personal sex life. "Our sexuality and choices about sex ... are interests of an intimate nature which define significant portions of our personhood." *Bloch*, 156 F.3d at 685. This Court concludes that Defendants' alleged actions of questioning all of Plaintiff's friends about his sex life and threatening them if they did not volunteer information might be regarded as "atrocious and utterly intolerable in a civilized community." *See Mills*, 212 Mich.App. at 91, 536 N.W.2d 824. Such conduct involves more than mere insults, indignities, threats, annoyances, or petty oppressions, and might cause an average member of the community, upon learning of Defendants' conduct, to exclaim, "Outrageous!" *See Mills*, 212 Mich.App. at 91, 536 N.W.2d 824. Reasonable minds may disagree as to whether Defendants' conduct was extreme and outrageous.

Plaintiff also claims that Defendants conduct was intentional and/or reckless. Defendants respond by correctly noting that Plaintiff "has not produced any evidence ... that the school defendants intentionally or recklessly to cause him severe emotional distress by investigating his [alleged] acts of sexual harassment." *See* Sch.Defs.' Br. at 14. Although Plaintiff claims that Defendants had animus toward him, he has provided no support for this allegation. Plaintiff's subjective assessment is not objective evidence of his allegations. *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir.2001). Moreover, such conclusory allegations, improbable inferences, and unsupported speculation are insufficient to defeat summary judgment. *See* Fed.R.Civ.P. 56(e); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir.1997) (stating that a Plaintiff's own deposition testimony provides little support for his claim).

Plaintiff's claim also fails because he cannot demonstrate that he has suffered severe emotional distress. Distress is extreme only to the extent that it is "so severe that no reasonable man could be expected to endure it." *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905 (1985). While Plaintiff asserts that he was and still is "suffering from severe emotional distress as a result of the actions of Defendants in this case," Aff. of Daniel R. Granger, he has not demonstrated *how* the investigation caused such distress. As stated earlier, self-serving, conclusory statements such as this, without more, are insufficient to defeat a motion for summary judgment. *See Penny*, 128 F.3d at 415; *see also Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir.1996) (stating "summary judgment affidavits cannot be conclusory" and "we generally consider self-serving opinions without objective corroboration not significantly probative"); *cf. Mitchell v. Toledo Hospital*, 964 F.2d 577, 584 (6th Cir.1992) (holding that conclusory statements are insufficient in summary judgment proceedings). Consequently, Defendants' motion for summary judgment is granted as to Count III.

**5. Summary Judgment is GRANTED as to Plaintiff's Due Process Claim**

Plaintiff argues that the school denied him procedural due process in suspending

Plaintiff from school for five days. Because the Court concludes that Plaintiff has not presented a triable issue of material fact as to this claim, Defendants' motion for summary judgment as to this claim is GRANTED.[10]

■ The seminal case involving school suspension of students is *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In *Goss*, the Supreme Court held that, to satisfy due process, before a school may suspend a student who enjoys an entitlement to continuing schooling, it must provide some form of pre-suspension hearing. *Id.* at 574–75, 95 S.Ct. 729. However, suspension without a prior hearing is allowed under certain circumstances. *Picozzi v. Sandalow*, 623 F.Supp. 1571, 1578–79 (E.D.Mich.1986) (citing *Joseph v. St. Charles Parish School Board*, 736 F.2d 1036, 1038 n. 2 (5th Cir.1984) (construing *Goss* to permit suspension of a tenured teacher without a pre-suspension hearing where "immediate disciplinary action is necessary to prevent further disruption of the educational process.")).

■ In *Goss*, the Supreme Court stated that:

Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an oppor-

tunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school. There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Id.* at 581–82, 95 S.Ct. 729.

■ In the instant case, Defendants claim that Plaintiff received the protections of procedural due process on June 5, 1998.[11] On this date, Plaintiff was called into assistant principal Teetaerts's office and allegedly confronted with the charge of violating the sexual harassment policy. Defendants contend that, at the June 5 meeting, "[P]laintiff received both oral and written notice of his 5–day temporary separation and was given an opportunity to respond." *See* Sch.Defs.' Br. at 24. Defendants further contend that during the meeting, Plaintiff was given a letter dated June 5, 1998 explaining the charges against him and advising him of the school's decision to separate him from school. According to Defendants, attached to the letter was a copy of the school policy on sexual harassment which outlines exam-

---

**10.** Because Plaintiff's rights under the Michigan Constitution essentially track those guaranteed by the United States Constitution, the same analysis that governs their federal constitutional claims applies to their corresponding state claims. *See Roy v. Rau Tavern, Inc.*, 167 Mich.App. 664, 423 N.W.2d 54, 56 (1988) (stating that the "Michigan Constitution secures the same right of equal protection and due process as does the United States Consti-

tution"); *see also Lucas v. Monroe County*, 203 F.3d 964, 972 n. 4 (6th Cir.2000).

**11.** Plaintiff also claims that his due process rights were violated because he was not told the name of his accuser and afforded an opportunity to cross-examine her. However, notice as to the identity of the accusers and the opportunity to cross-examine the accusers is not part of the due process requirement. *Paredes v. Curtis*, 864 F.2d 426 (6th Cir.1988).

ples of sexual harassment. Defendants have attached the June 5 letter as Exhibit D to Defendants' brief. The Court has reviewed the June 5 letter, and determines that, by itself, it does not satisfy due process.

The June 5 letter, directed to Mr. and Mrs. Granger and signed by Defendant Teetaert, stated in part: "I regret to inform you that it has been necessary to temporarily separate Dan from Grosse Pointe North High School. This action was taken because of his violation of the school district's sexual harassment policy." *See* Sch.Defs.' Br. at Ex. D. The letter continued: "You are further advised, however, that the school district continues to have under consideration other disciplinary action up to and including the expulsion of Dan based on the egregious nature of his actions." *Id.* These are the only passages of the letter that speak to the charges against Plaintiff.

The letter fails to satisfy due process because it does not delineate or explain the allegations against Plaintiff; it merely stated in a conclusory fashion that Plaintiff was being suspended for violations of the district's sexual harassment policy. Although the letter ends by informing Plaintiff that he "may exercise [his] right to appeal this action by making an appointment with the principal, Dr. Caryn Wells," *id.*, the appeal does not constitute the pre-suspension hearing contemplated by *Goss.*

However, the Court determines that Plaintiff has not demonstrated a genuine issue of material fact as to whether Plaintiff received due process via the conversation between Plaintiff and Defendant Teetaert that took place during their June 5 meeting. Defendant Teetaert states in his affidavit that Plaintiff was orally informed of the charges and given an opportunity to respond. Specifically, Defendant Teetaert testifies that he met with Plaintiff "in connection with the allegations that he had violated the school's sexual harassment policy by verbally harassing female students," and that he "orally discussed and summarized" with Plaintiff the matters stated in the June 5 letter. *See* Sch.Defs.' Br. at Ex. F.

Plaintiff claims that little or no conversation regarding the allegations of sexual harassment took place and that he was not informed of the facts underlying the grounds for dismissal. However, Plaintiff's deposition reveals that Plaintiff was asked on at least two occasions whether he had been informed of the underlying charges leading to his separation. *See, e.g.,* June 15, 2000 Dep. of Daniel Granger, page 285, at lines 16–22; pages 287–88. Plaintiff responded equivocally to these questions, but never denied having received notice of these allegations.

For example, Defendants' counsel asked Plaintiff: " . . . so all you were told is that you were being suspended or separated for violating the sexual harassment policy?" *See* June 15, 2000 Dep. of Daniel Granger, pages 287–88. Plaintiff answered, "If I didn't it was because the—forum it took place in wasn't very conducive to a . . . it wasn't really a discussion." *Id.* at 288, lines 2–5. When asked whether Defendant Teetaert had given Plaintiff the documents Defendants claim were attached to the June 5 letter, Plaintiff responded: "Well, I'm—I don't think it happened, but I wouldn't say it with certainty because I don't remember it happening." *See id.* at 280, lines 11–13. Such responses represent the type of "metaphysical doubt" the Supreme Court has determined is insufficient to satisfy a non-movant's burden of coming forth with evidence demonstrating a triable issue of material fact. *See Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548

The Supreme Court recognized that "[t]here need be no delay between the time

'notice' is given and the time of the hearing." *Goss,* 419 U.S. at 582, 95 S.Ct. 729. While the June 5 letter does not inform Plaintiff of what the charges were, the affidavit testimony of Defendant Teetaert stating that Plaintiff was informed of the charges against him is, essentially, uncontroverted. Plaintiff has not adduced evidence to contradict Defendants' contention that Plaintiff knew the facts surrounding Defendants' decision to separate him from school. Nor is there a triable issue of material fact as to whether Plaintiff had, as Defendants assert, "ample opportunity to present his story at his June 5, 1998 meeting with the assistant principal." *See* Sch.Defs.' Br. at 24. Defendants had the responsibility of providing notice of the charges to Plaintiff prior to his separation on June 5, 1998. Plaintiff has not presented evidence that Defendants failed in this regard. Count VI must be **DISMISSED.**

**6. Summary Judgment is GRANTED as to Plaintiff's Equal Protection Claim**

Plaintiff claims that he has been denied equal protection under the United States and Michigan Constitutions. Defendants respond that Plaintiff lacks standing to raise this claim. In the alternative, Defendants assert that there is no evidence of an equal protection violation in this case. This Court concurs with Defendants' latter contention.

■■■■ In order to establish an equal protection violation, Plaintiff must show that his complaints were treated differently by the Defendants than were complaints by Plaintiff's female counterparts. *See Soper v. Hoben,* 195 F.3d 845, 852 (6th Cir.1999) (citing *Soto v. Flores,* 103 F.3d 1056, 1067 (1st Cir.1997)). The Equal Protection Clause forbids only intentional discrimination. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). When a facially neutral rule, such

as the sexual harassment policy at issue in this case, is challenged on equal protection grounds, the plaintiff must show that the rule was promulgated or reaffirmed *because of,* not merely in spite of, its adverse impact on persons in the plaintiff's class. *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences." *Id.* The necessary showing of intent may be made in a variety of ways. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Disproportionate impact, though not irrelevant, "is not the sole touchstone of ... discrimination." *Davis,* 426 U.S. at 242, 96 S.Ct. 2040.

A court is required to undertake a "sensitive inquiry" into such circumstantial and direct evidence of intent as may be available to determine whether invidious discriminatory purpose was a motivating factor. *Horner v. Ky. High Sch. Athletic Ass'n,* 43 F.3d 265, 276 (6th Cir.1994). Whether the impact of the official action bears more heavily on one gender than another may provide an important starting point. "Sometimes a clear pattern, unexplainable on grounds other than [gender], emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare." *Id.* (citing *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555). Only that type of impact which is "significant, stark, and unexplainable on other grounds" is sufficient in itself to prove intentional discrimination. *Id.*

■■■ The essence of Plaintiff's equal protection claim is found in paragraphs 136 and 137 of his Complaint, wherein he claims that Defendants' sexual harassment policy is enforced arbitrarily against males

only, "in particular this Plaintiff," and that Defendants used the sexual harassment policy as a "blackmail tool to vent the Defendant's (sic), District, School Board, Wells, Klein, and Teetaert's animus toward certain students, including this Plaintiff." Aside from Plaintiff's self-supporting and conclusory statements, Plaintiff has provided no evidence supporting these allegations. Nor has Plaintiff shown that any alleged disparate treatment of complaints were done "because of, not merely in spite of, the harmful [disparate] effect that such treatment would have." *See Feeney*, 442 U.S. at 279, 99 S.Ct. 2282. Plaintiff has not even shown that he made any complaints to school officials about alleged sexual harassment. Plaintiff's equal protection claim is DISMISSED.

### 7. Summary Judgment is GRANTED as to Plaintiff's Title IX Claim

Plaintiff argues that the Defendant District has violated Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 by failing to remedy an allegedly hostile educational environment at the High School. Defendants retort that Plaintiff lacks standing to bring suit under Title IX. Alternatively, Defendants assert that Plaintiff's claim is moot because he has already graduated from the High School. Finally, Defendants argue that Plaintiff's pleadings have not established a violation of Title IX. The Court concludes that, while Plaintiff has standing to assert a Title IX claim and that his claim is not moot, Plaintiff has failed to establish a *prima facie* case of Title IX gender discrimination. Count VIII of Plaintiff's Complaint is DISMISSED.

 Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal finan-

cial assistance." 20 U.S.C. § 1681. Title IX may support a claim for student-on-student sexual harassment when the plaintiff can show: (1) that the funding recipient had *actual knowledge* of sexual harassment; (2) that the sexual harassment was so *severe, pervasive, and objectively offensive* that it could be said to *deprive the plaintiff of access to the educational opportunities* or benefits provided by the school; (3) that the funding recipient was *deliberately indifferent* to the harassment; and (4) that the school had *control* over both the harasser and the context in which the harassment occurred. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 631–43, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *see also Soper*, 195 F.3d at 854.

 Plaintiff claims an amalgamation of various theories of Title IX liability. First, Plaintiff states that school officials refused to investigate incidents allegedly causing the High School to be a sexually hostile educational environment. Specifically, Plaintiff contends that the District is liable under Title IX because Defendants Wells and Teetaert failed to investigate and/or stop certain female students from offering and giving sexual favors to other students in exchange for rides off campus at lunch time. Plaintiff also claims that school administrators refused to investigate the High School baseball bus incident where a certain female student was allegedly giving sexual favors to a male student.

Plaintiff contends that the High School failed to publish any sexual harassment policy potentially in place so that students could become aware of such policy and that any such policy did not have proper and required appeal processes for a student who had been falsely accused of sexual harassment such as Plaintiff.

 Defendants argue that Plaintiff lacks standing to institute a Title IX claim.

Defendants also argue that Plaintiff's Title IX claim is moot. This Court disagrees with both contentions. The United States Constitution limits the jurisdiction of this Court to matters that present actual cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1. This limitation means that when a plaintiff brings suit in federal court, he must have standing to pursue the asserted claims. Generally, if the plaintiff loses standing at any time during the pendency of the court proceedings, the matter becomes moot, and the court loses jurisdiction. *See generally Church of Scientology of California v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (internal quotation marks omitted)).

■■■■■ To have standing to bring suit, a plaintiff must allege "injury in fact" to his preexisting, legally protected interest. The injury must be "(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (internal quotation marks omitted). Particularized "mean[s] that the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n. 1, 112 S.Ct. 2130. Generally, a plaintiff " 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The rare exceptions to this rule generally involve situations in which the plaintiff has a close relation with the third party and "there exists some hindrance to the third

party's ability to protect his or her own interests." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 629, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). For example, parents generally have standing to assert the claims of their minor children. *See, e.g., Engel v. Vitale*, 370 U.S. 421, 423, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 841 n. 44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

■■■■ While much of Plaintiff's Amended Complaint appears to assert the rights of other students at the school, Plaintiff also alleges that he, himself, was subjected to a hostile educational environment. That Plaintiff had already graduated from the High School when he commenced this lawsuit does not deprive him of standing to bring a Title IX claim. *Cf. Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (allowing a former student to bring a claim under Title IX for teacher-on-student sexual harassment). This Court concludes that Plaintiff has standing to bring a Title IX claim to redress his alleged exposure to a hostile educational environment.

■■■■ While the standing doctrine evaluates a litigant's personal stake as of the outset of the litigation, the mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit including the pendency of the appeal. See *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396–97, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). As to the mootness doctrine, "[t]he usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Therefore, even as to claims that plaintiffs originally had standing to assert, the court must

determine whether those claims remain live controversies or have become moot.

██ "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *New York City Employees' Retirement System v. Dole Food Co.*, 969 F.2d 1430, 1433 (2d Cir.1992) (internal quotation marks omitted). In *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, for example, the plaintiffs challenged a state statute providing for the reading, without comment, of five verses of the Old Testament at the opening of each public-school; one of the plaintiffs asserted standing on the ground, *inter alia*, that his daughter was a public-school student. The Supreme Court rejected that ground, however, noting that the daughter "had graduated from the public schools before th[e] appeal was taken to th[e Supreme] Court," and stating that "[o]bviously no decision we could render now would protect any rights she may once have had[;] ... this Court does not sit to decide arguments after events have put them to rest." *Id.* at 432–33, 72 S.Ct. 394.

██ If a claim has become moot prior to the entry of final judgment, the district court generally should dismiss the claim for lack of jurisdiction. *See, e.g., Detroit, Toledo and Ironton R. Co. v. Consolidated Rail Corp.*, 767 F.2d 274 (6th Cir.1985) (affirming mootness dismissal). A narrow exception to the principle that a moot claim is to be dismissed is that the court may adjudicate a claim that, though technically moot, is "capable of repetition, yet evading review." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see Weinstein v. Bradford*, 423 U.S. 147, 148–49, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam). This exception is available "only in exceptional situations." *Weinstein*, 423 U.S. at 149, 96 S.Ct. 347.

██ That "capable of repetition yet evading review" exception is not applicable, however, unless the repetition would affect the same complaining party. *Id.* at 149, 96 S.Ct. 347. In the absence of a class action, therefore, this exception is not available when the issue is prospective or injunctive relief for students who have graduated from the defendant institution. *See, e.g., Board of School Commissioners of Indianapolis v. Jacobs*, 420 U.S. 128, 129–30, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam) (dismissing as moot a challenge by high-school students to regulation of their school newspaper, after the court learned at oral argument that all plaintiffs had graduated); *see also Cook v. Colgate*, 992 F.2d 17, 19 (2d Cir.1993) (mooting a gender discrimination claim under Title IX because plaintiffs had graduated from school and had only appealed the district court's denial of injunctive relief). In the instant case, Plaintiff has graduated from the High School, but has requested damages. A viable claim for damages generally avoids mootness of the action. *See University of Texas v. Camenisch*, 451 U.S. 390, 393–94, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *see also* 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3D § 3533.3, at 262 (2d ed.1984). Therefore, Plaintiff's Title IX claim is not moot.

Turning to the elements of a Title IX action for peer sexual harassment, this Court concludes that Plaintiff has failed to present sufficient evidence to warrant submission of his Title IX claim to the trier of fact. Although Plaintiff has asserted that a female student performed a sexual favor on a male student while riding on a school bus, he admitted in his deposition that he had no knowledge that the school either knew of, or refused to investigate the bus incident. *See* Dep. of Daniel Granger at 346–50. Plaintiff further admitted that he

had no evidence that the school was failing to address or remedy the offensive language allegedly used by students against other students at the school, *id.* at 420. Nor has Plaintiff adduced evidence that the school knew that female students offered sexual favors for rides off campus during lunch and failed to address this fact. Finally, while the incidents alleged to have occurred may be considered "severe, pervasive and objectively offensive," there is no evidence that Plaintiff was deprived of an educational opportunity thereby.

As stated in the discussion of Plaintiff's equal protection claim, Plaintiff has provided no evidence supporting his allegations of sexual harassment aside from his generalized, self-supporting and conclusory statements. *See generally* Am.Compl. at ¶¶ 63–80, 139–146. Based on these allegations, the District cannot be held liable under Title IX. This claim must also be DISMISSED.

8. **Summary Judgment is GRANTED as to Plaintiff's Tortious Interference with Contractual Relationships Claim against Defendant Wells.**

Plaintiff contends that he "had a contract of admissions with the University of Michigan to matriculate at that school beginning the fall semester of 1998." *See* Compl. at ¶ 151. Plaintiff argues that Defendant Wells tortiously interfered with this "contractual relationship."

■■■■ The elements of tortious interference with a contractual relationship are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. *Wood v. Herndon & Herndon Investigations, Inc.,* 186 Mich. App. 495, 499–500, 465 N.W.2d 5, 8 (1990); *see also Tata Consultancy Services, a Div. of Tata Sons Ltd. v. Systems Intern., Inc.,* 31 F.3d 416, 422 (6th Cir.1994) (applying Michigan law). "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Wood,* 186 Mich. App. at 499–500, 465 N.W.2d at 8 (quoting *Jim–Bob, Inc. v. Mehling,* 178 Mich.App. 71, 95–96, 443 N.W.2d 451 (1989)).

Defendant Wells contends that Plaintiff's "admission to the U of M did not constitute a 'contract' between himself and the University," but does not actively argue this point and does not cite any authority for this proposition. *See* Sch.Defs.' Br. at 31. Instead, Defendant Wells argues that "[e]ven if plaintiff could show both the existence of a contract and a breach of that contract, he still could not prevail, since he cannot show that defendant Wells or the school defendants instigated any such breach." *Id.* As Defendant Wells has not fully developed this argument, the Court assumes for the purpose of this claim that Plaintiff had a "contract" to matriculate into the University of Michigan and that this contract was breached. Notwithstanding this assumption, the Court determines that this claim must also be DISMISSED.

■■■■ Plaintiff's Amended Complaint states that Defendant Wells knew about the contract of admissions with the University of Michigan, that Defendant Wells contacted the admissions office at the University a couple of days before Plaintiff was to begin his matriculation, and that Defendant Wells made untrue statements to the admissions office of the University which ultimately resulted in the University of Michigan breaching its contract with the Plaintiff. *See* Am.Compl. at ¶¶ 151–53.

Defendant Wells' only response is that she did not "instigate" the breach of the

alleged contract. For support, Defendant Wells cites to her deposition testimony, wherein she states that she never sent any information from Plaintiff's discipline record to the University. Plaintiff has affixed no signed affidavits to his response brief refuting Defendant Wells' assertions. This leaves Plaintiff to rely on his Amended Complaint to contradict Defendant Wells' assertions and stave off summary judgment, which Plaintiff may not do. *See* Fed.R.Civ.P. 56(e). Defendant Wells' statements are, therefore, uncontroverted. As no genuine issue of material fact exists as to whether Defendant instigated the alleged breach of contract, summary judgment is appropriate. *See Celotex*, 477 U.S. 317, 322–23, 106 S.Ct. 2548 (stating that summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial because in such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial).

### 9. Summary Judgment is GRANTED as to Plaintiff's Negligence claim against Defendant Jostens.

 Plaintiff claims that Defendant Jostens negligently published the photo at issue in this case by failing to proofread the yearbook. To establish a claim for negligence, Plaintiff must demonstrate that: (1) Defendant Jostens owed him a duty; (2) Defendant Jostens breached its duty; (3) Plaintiff suffered damages; and (4) Defendant Jostens breach proximately caused Plaintiff's damages. *See Case v. Consumers Power Co.*, 463 Mich. 1, 6, 615 N.W.2d 17, 20 (2000). Whether a duty exists is a question of law for the Court to

determine. *Beaudrie v. Henderson*, 465 Mich. 124, 130 631 N.W.2d 308, 311 (2001).

Defendant Jostens argues that it did not owe a legal duty to Plaintiff because there was no "relationship" between Plaintiff and Defendant Jostens. *See* Jostens' Br. at 9. In Defendant Jostens' estimation:

> Jostens simply printed and returned the yearbook in the form provided to it by [the High School]. Jostens' actions in this cases (sic) are analogous to the situation where a person takes material (a yearbook) to a logical print shop and asks the print shop employee for copies. The print shop would naturally make the copies and return the copies to the requestor. In this situation no duty would be placed on the print shop employee to review the contents of the material copied. Similarly, Jostens did not have a legal duty to review the material submitted to it by [the High School] for printing.

*Id.* at 9–10.

Plaintiff responds by citing a provision in the contract entered into between the High School and Defendant Jostens. According to Plaintiff, the contract states that "[t]he Company reserves the right to refuse to print material submitted by the Customer for any reason specifically including material which ... invades a person's right to privacy." *See* Pl.'s Resp.Br. to Def. Jostens at 2. As Defendant Jostens pointed out during the hearing, however, Plaintiff grossly misstates this provision of the contract. In its entirety, the provision provides:

> The Company reserves the rights to refuse to print material submitted by the Customer for any reasons specifically including material which may violate trademark, copyright or other proprietary rights. The Customer agrees to indemnify and hold Company harmless from any and all damages (including

reasonable attorneys' fees) arising out of claims, demands, actions or proceedings that may be asserted or instituted against the Company on the grounds that the publication violates a trademark, copyright or other proprietary right or that contains material that is libelous, slanderous or invades a person's right to privacy. The Customer agrees to promptly defend Company, at Customer's sole expense, against any such claim, demand, action or proceeding providing that Company has given Customer prompt notice of the existence of the claim, demand or action.

Pl.'s Resp.Br. to Sch.Defs. at Ex. 1.

Placed in context, the Publication Agreement cannot be read to require Defendant Jostens to edit the yearbook, and Plaintiff has offered no legal authority for his contrary position. As Plaintiff asserts, this provision "clearly indicates that [Jostens] must first read the materials before it can find any objections and further that it has the right to refuse to print such material ie (sic) edit." *Id.* at 11. However, this Court is not persuaded that Defendant Jostens' retention of the right to refuse to print any item that potentially invaded an individual's right to privacy means that Defendant Jostens was *required* to edit the yearbook. The provision referring to the right of privacy is essentially an indemnification agreement between the parties, undoubtedly agreed to in contemplation of situations such as the instant suit. This Court finds, as a matter of law, that Defendant Jostens owed no duty to Plaintiff. Because there is no duty, summary judgment is appropriate. *See Beaudrie,* 465 Mich. at 124, 130 631 N.W.2d at 311.

### 10. Qualified Immunity

The Court notes that the School Defendants have filed two dispositive motions in this action. Neither motion has addressed the lack of personal involvement, municipal liability and qualified immunity relating to a § 1983 claim alleging violations of the United States Constitution.

In order for a municipality or a supervisor to be liable under § 1983 there must be some personal involvement or evidence that "execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally, the doctrine of respondeat superior has no application in a § 1983 claim absent an allegation that the defendants were following the government's policies or customs. *Dunn v. Tennessee,* 697 F.2d 121, 128 (6th Cir.1982).

Similarly, public officials carrying out executive responsibilities are entitled to qualified immunity from personal liability for money damages under § 1983. Under the doctrine of qualified immunity, such an official will not be found personally liable for money damages unless the official's actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The "clearly established" rights allegedly violated by the official cannot be considered at an abstract level, but must be approached at a level of specificity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). A plaintiff must prove two factors to show that a government official is not entitled to qualified immunity from suit: 1) that facts as alleged by him show a violation of a constitutional right; and 2) that such violated right was clearly estab-

lished. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

Qualified immunity is an initial threshold question the court is required to rule on early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *Id.* Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

As stated previously, these doctrines were not raised by Defendants in either of their dispositive motions. Accordingly, the Court will not address the merits of these issues. The Court merely notes that they are normally raised prior to trial to potentially avoid the burdens of litigation.

## IV. CONCLUSION

Plaintiff has failed to show a genuine issue of material fact regarding Counts I, III, IV, VI, VII, VIII, IX, and X. Plaintiff also voluntarily dismissed Count V of his Amended Complaint. Summary judgment is appropriate as to these claims. However, Plaintiff has presented triable issues of material facts as to Count II. Defendants' Motion for Summary Judgment is denied as to these claims.

Accordingly,

**IT IS HEREBY ORDERED** Plaintiff's Motion to Amend (**Docket Number 52, filed July 2, 2001**) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants Grosse Pointe School District, Klein Wells, Teetaert and Clein's Motion for Summary Judgment (**Docket Number 51, filed June 29, 2001**) is **GRANTED** as to Counts I, III IV, V, VI, VII, VIII, IX, and X and **DENIED** as to Count II.

**IT IS FURTHER ORDERED** that Defendant Jostens Motion for Summary Judgment (**Docket Number 50, filed June 29, 2001**) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Jostens Motion for Involuntary Dismissal (**Docket Number 59, filed October 16, 2001**) is **MOOTED.**

**IT IS FURTHER ORDERED** that the remaining parties are to appear for a Status Conference on Monday, April 29, 2002, at 4:15 p.m.